Jess J. Ellis v. Commissioner.
Jess J. Ellis v. Commissioner.
Docket No. 26888.
United States Tax Court
1951 Tax Ct. Memo LEXIS 297; 10 T.C.M. (CCH) 234; T.C.M. (RIA) 51076; March 13, 1951
*297 Edward R. Moran, Esq., 807 Ohio Bldg., Toledo, Ohio, for the petitioner. Cyrus A. Neuman, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax of $6,883.53 and $27,565.92 in the calendar years 1946 and 1947, respectively. The issue for decision is whether the Commissioner erred in adding to petitioner's income in each year the entire income of an "alleged" partnership between petitioner and his son. Findings of Fact The petitioner is an individual. He filed his income tax returns for 1946 and 1947 with the collector of internal revenue for the tenth district of Ohio at Toledo, Ohio. Petitioner had been in the automobile business since 1918. In December 1945 he was the sole proprietor of Grand Motors, Inc., a used automobile business. At that time petitioner's son, James, was nineteen and a half years old. He had been serving in the United States Navy since January 1945 and both he and his father expected that he would be discharged in the near future. During a visit home at Christmas time 1945 the petitioner, Jess, and James discussed with their attorney the formation *298 of a partnership to carry on the automobile business. The question of forming a partnership had been discussed on several occasions before by the family and it was the hope of father and son that it could be accomplished as soon as practicable. As a result of the Christmas discussion the following agreement was signed of December, 1945, by and between Jess J. Ellis and James J. Ellis, of Toledo, Ohio. "The parties hereto have agreed to and do by these presents become partners, beginning on the 1st day of January, 1946, under the firm name and style of 'Grand Motor Sales', with principal office and place of business at 901 Grand Avenue, Toledo, Lucas County, Ohio. "The purpose and business of said partnership shall be the buying and selling of new and used automobiles, motorcycles and trucks, and the doing of all things necessary and incident thereto. "The said Jess J. Ellis and James J. Ellis shall each contribute a sum equal to Fifty (50%) per cent of the capital of said partnership. "Each of said partners shall devote his entire time, skill, labor and experience to advancing and rendering profitable the interests and business of said partnership. "Each partner agrees that *299 all gain, profit, advantage and increase which shall arise by reason of said copartnership or joint business as aforesaid shall, from time to time during the existence of said partnership, be divided equally between them, and all losses shall be borne in the same manner. "There shall be kept at the principal office and place of business of said firm, at all times during the continuance of said partnership, a true, accurate and full account and complete books, in which shall be entered all moneys received and disbursed by said partnership, all merchandise and other property bought and sold for or on account of the business of the firm, all contracts, obligations and liabilities incurred, and also all other matters and things in any manner appertaining or belonging to the business of said firm." James had been working for and with his father in the used car business since he was fourteen years of age and was familiar with the business. During this period he had also conducted a number of transactions in used cars on his own and realized a profit on them. Jess had been critically ill for several years when the partnership agreement was signed and knew he would have to undergo surgery *300 at an early date. He had not been able to devote much time to managing the business and had lost a franchise for selling Chrysler cars because of his ill health. He had some assurance that if "new blood" were taken into the business a new Chrysler franchise might be granted. James put $1,100 of his own cash into the business when the agreement was signed and also gave his father a promissory note dated December 26, 1945 in the amount of $5,233.87 for his half interest. The total of these amounts approximated one-half of the total book value of the Grand Motors business at the time. The income from the business in the years 1941 through 1945 was small. The best year was 1945 when about $3,000 was earned. On January 1, 1946, Grand Motors had $2,257.06 cash on hand and in the bank. On January 3, 1946, a Chrysler dealer franchise under a distributor was granted to Grand Motors, "a Partnership", and in February of the following year a direct Chrysler franchise was granted the partnership. James was discharged from the Navy on July 20, 1946. In the meantime he had tried to keep himself informed of the progress of the business. Upon James' return home, Jess devoted little time to *301 the business. He began consultations with various physicians and underwent a series of six operations between October 12, 1946 and March 1947. He spent some time in Florida recuperating and was operated on again in September 1947. James took over the operation and management of the business from the time he came home from the Navy and performed most of the executive duties, among which were the following - passing on trade-in allowances, seeing that cars were properly equipped and made ready for sale, handling employees' complaints, supervising advertising, executing notes and chattel mortgages to purchase cars and signing checks and letters. Between September 1946 and May 1947 James attended the University of Toledo for two semesters. His tuition and books were paid for under the "G. I. Bill of Rights", but he asked no subsistence allowance since he thought he was entitled to none because of his business earnings. The University was within one or two miles from home and while college interfered to some extent with his duties at Grand Motors, he nevertheless devoted a substantial part of his time to the business and was successful in its operation. After May 1947 James devoted *302 full time to the affairs of Grand Motors. From its inception until the business was incorporated as of February 1, 1948, Grand Motors was held out to the public as a partnership consisting of Jess and James and it operated as a partnership. In 1946 and 1947, James resided at home, was charged nothing for his room and board and lived a very inexpensive and quiet social life. He needed little for living expenses and withdrew little from the business. On January 31, 1948, there was a credit balance of $47,569.63 in his account. Jess, on the same date, had an overdrawn balance of $15,727.85. This was caused by the payment, without his knowledge or prior consultation with him, of substantial medical expenses on his behalf with Grand Motors' funds. This difference was adjusted when the business was incorporated. Jess and James have equal interests in the new corporation. The balance in James' favor on the partnership books was reconciled by Jess giving his promissory note to James which was later paid off. The cash realized from these transactions by James had been treated as his own. Petitioner and his son were bona fide equal partners in the operation of Grand Motors during 1946 *303 and 1947. Petitioner reported one half of the income therefrom in each year on his income tax returns and his son reported the other one half. The Commissioner in determining the deficiencies included all of the income from Grand Motors in the taxable income of petitioner. Opinion We must decide whether Jess and James "really and truly intended to join together" as partners "for the purpose of carrying on business and sharing in the profits or losses or both". Commissioner v. Culbertson, 337 U.S. 733. We need not bother with the formalities of the arrangement between father and son. They were advised by their lawyer and following his advice did all of those things necessary to satisfy the legal niceties in setting up a partnership. The question remains, whether the performance of the niceties was an empty ritual or an honest to goodness joining together as partners in the conduct of the enterprise. We think the arrangement between Jess and James entered into during the Christmas holidays in 1945 and which continued in existence during the taxable years 1946 and 1947 was characterized by the good faith and honest intent required to give substance to form. It was *304 a real partnership and should have been recognized as such by the Commissioner. In arriving at this conclusion we have not overlooked the Commissioner's argument that since James was still in the Navy when the partnership agreement was signed December 26, 1945, the agreement could not have been made with the intent to join together in the "present conduct of the enterprise" in 1946. This circumstance did prevent James from rendering personal services to the business until July 1946. But it did not prevent his immediate contribution of value in other respects. He put $1,100 cash into the business at the time the agreement was signed, a time when cash on hand in the business was low. Also, the uncontroverted evidence is to the effect that it was his agreement to take part in the business that constituted the "new blood" on which depended the securing of the all-important Chrysler franchise. That franchise was forthwith obtained for "the partnership". These facts coupled with the honest expectation held by both father and son that the son would soon be discharged from the service are strong evidence of the bona fides of the partnership. That there was real basis for the expectation *305 of early discharge is borne out by the fact that James was let out of service the following summer. The Commissioner also suggests as a reason for disregarding the partnership for tax purposes that the father continued to dominate the business and that James was less than a real partner because he withdrew very little from the business while his father was substantially overdrawn. The record, however, strongly refutes this argument. In the first place, it shows that James was a frugal and quiet young man living at home and in little need of funds. And secondly, it shows that the father was over-drawn because without his knowledge his substantial medical expenses had been paid out of partnership funds by James after consultation with their attorney. This use of partnership funds without the father's knowledge is hardly evidence that the father dominated the business. Little argument can be made that James did not contribute valuable personal services to the partnership during the taxable years. He did. The argument that is made is that James' services did not commence until July 1946 and that they were interrupted by two semesters of college attendance. In the meantime, however, *306 he had put money into the business and his addition to the firm had helped obtain the Chrysler franchise. Nor did college attendance critically interfere with the business. College was close by. He continued to live at home and dropped courses which impinged on needed business time. He worked seriously and conscientiously at Grand Motors notwithstanding his interest in his studies. Decision will be entered for the petitioner.